IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
·FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

NOV 24 2014

CLERK, U.S. DISTRICT COURT
By_____
          Deputy

STEVEN KEITH GREEN,           §
                              §
        Petitioner,           §
                              §
v.                            §       No. 4:13-CV-548-A
                              §
WILLIAM STEPHENS, Director,   §
Texas Department of Criminal  §
Justice, Correctional         §
Institutions Division,        §
                              §
        Respondent.           §

## MEMORANDUM OPINION
### and
### ORDER

This is a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner, Steven Keith Green, a state prisoner confined in the Correctional institutions Division of the Texas Department of Criminal Justice (TDCJ), against William Stephens, Director of TDCJ, respondent.  After having considered the pleadings, state court records, and relief sought by petitioner, the court has concluded that the petition should be denied.

## I.   FACTUAL AND PROCEDURAL HISTORY

In May 2008 petitioner was charged by indictment in Tarrant County, Texas, with three counts of sexually assaulting his teenage daughter, H.G.  Clerk's R. 2, ECF No. 16-1.  The indictment also included a repeat offender notice.  *Id.*  On

February 24, 2010, a jury found petitioner guilty on all counts,
petitioner pleaded true to the repeat-offender notice, and the
jury assessed his punishment at 75 years' confinement on each
count.  The trial court ordered the sentences to run
consecutively.  Clerk's R. 216-225, ECF No. 16-2.  The Second
District Court of Appeals of Texas set forth the factual
background of the case as follows:

> H.G. is Green's biological daughter.  H.G. lived
> with her mother until she was eleven years old, when
> she moved in with Green and his wife Melissa.  When
> H.G. was thirteen, she went on a trip to California
> with Green.  Green and H.G. shared a bed in their hotel
> room, and one night, Green performed oral sex on H.G.
> Green also had H.G. perform oral sex on him during the
> trip.
>
> The two continued performing oral sex on each
> other after they returned to Texas.  At some point that
> year, while H.G. was still thirteen, Green began having
> sexual intercourse with her.  Green and H.G. had sex in
> her room twice a week, and he always ejaculated into a
> towel.  Melissa began noticing unusual behavior between
> Green and H.G.—H.G. always got in bed with Green when
> Melissa got up, they "spoon[ed]" on the couch, and
> Melissa twice saw H.G. lying on the couch with her face
> in Green's lap turned to his crotch.  Green and H.G.
> texted each other frequently when they were in the same
> room with Melissa.  Melissa moved out of the master
> bedroom and stayed in a different bedroom for about two
> months; during that time, H.G. and Green shared the
> same bed "every night."  Melissa thought the behavior
> was strange and even asked Green if he was having a
> sexual relationship with H.G.  Green responded that the
> accusation was disgusting because H.G. was his
> daughter.  Melissa ultimately moved out when H.G. was
> fifteen or sixteen.

After Green and Melissa separated, Green and H.G. continued living together alone. When H.G. was sixteen, she and Green moved into a two-bedroom apartment in Crowley, where they continued to have sexual relations. Green worked out of town, and H.G., who had dropped out of school, lived there alone during the week. The two shared a bedroom in the apartment when Green returned on weekends, and they had sex each weekend.

H.G.'s brother Daniel, who also stayed at the apartment from time to time, testified that he always slept on the couch and that H.G. and Green slept in the same bed together upstairs. Daniel testified that the living arrangements were "weird" but that he "just didn't want to think about it."

H.G. eventually told her maternal uncle about her and Green's sexual relationship. H.G., her uncle, her mother, and her stepfather went to the police station to report Green to the authorities. Officer Kevin Newman of the Crowley Police Department later escorted H.G. to the apartment she shared with Green to get her things. While they were there, H.G. showed Officer Newman the bed she and Green shared; she pointed out two towels on the floor beside the bed and informed the officer that Green had ejaculated onto the towels the last time they had sex. Officer Newman took a sheet from the bed and the two towels for DNA testing.

DNA samples taken from the same quarter-inch section of one of the towels matched H.G.'s epithelial cells and Green's sperm cells. DNA samples from the other towel and from the sheet also matched Green's sperm cells and contained a minor component of epithelial cells compatible with H.G.'s DNA.

Mem. Op. 2-3, ECF No. 13-3.

The appellate court affirmed the trial court's judgments, and, in turn, the Texas Court of Criminal Appeals refused

3

petitioner's petition for discretionary review.   PDR No. 1330-11,
ECF No. 14-3.   Petitioner also filed three postconviction state
habeas applications challenging his convictions, which were
denied by the Texas Court of Criminal Appeals without written
order.   SH3a - writ WR-78,871-02, cover, ECF No. 18-1; SH5a -
Writ WR-78,871-03, cover, ECF No. 19-1; SH7a - writ WR-78,871-04,
cover, ECF No. 20-1.   This federal habeas petition followed.

## II.   ISSUES

Petitioner raises the following grounds for habeas relief:

(1)   "Double jeopardy - successive punishments;

(2)   Ineffective assistance of counsel - failure to
      challenge for cause or strike a biased juror; and

(3)   Cross[-]examination restricted - confrontation
      clause."

Pet. 6-7, ECF No. 1.

## III.   RULE 5 STATEMENT

Respondent does not contend that Petitioner's claims are
unexhausted or that the petition is time-barred or successive.
Resp't's Ans. 5, ECF No. 24.

## IV.   LEGAL STANDARD FOR GRANTING HABEAS CORPUS RELIEF

A § 2254 habeas petition is governed by the heightened
standard of review provided for in the Anti-Terrorism and
Effective Death Penalty Act (AEDPA).   28 U.S.C. § 2254.   Under

4

the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established Supreme Court precedent or that is based on an unreasonable determination of the facts in light of the record before the state court. *Harrington v. Richter,* 131 S. Ct. 770, 785 (2011); 28 U.S.C. § 2254(d)(1)-(2).  This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings."  *Harrington,* 131 S. Ct. at 786.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000).  Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct.  This presumption of correctness applies to both explicit findings of fact and those findings of fact implicit in the state court's mixed-law-and-fact conclusions. *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001).  The applicant has the burden of rebutting the presumption of correctness by clear-and-convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); *Williams v. Taylor,* 529 U.S. 362, 399 (2000).

Finally, when the Texas Court of Criminal Appeals denies relief in a state habeas corpus proceeding without written

5

opinion, as in this case, it is typically an adjudication on the merits, which is entitled to the presumption. *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). Under these circumstances, a federal court may assume the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was applied. *Townsend v. Sain,* 372 U.S. 293, 314 (1963)[1]; *Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir.2002); *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001); *Goodwin v. Johnson,* 132 F.3d 162, 183 (5th Cir. 1997).

## V. DISCUSSION

### 1. Double Jeopardy

Under his first ground, petitioner claims that the trial court's unlawful and unconstitutional conditions of his pretrial bail—specifically, the requirement that he pay a supervision fee and the costs for electronic monitoring and drug testing, were "punitive and caused jeopardy to attach when [he] exercised his fundamental right to bail," thereby prohibiting his subsequent prosecution for the underlying criminal charges.[2] Pet'r's Mem.

---

[1]The standards of *Townsend v. Sain* have been incorporated into 28 U.S.C. § 2254(d). *Harris v. Oliver*, 645 F.2d 327, 330 n.2 (5th Cir. 1981).

[2]Petitioner challenged the conditions of his pretrial bond in, both, a prior federal habeas petition and a civil rights action in this court. *Green*

7-9, ECF No. 2.

The Double Jeopardy Clause protects against the imposition of multiple punishments for the same offense. *North Carolina v. Pearce,* 395 U.S. 711, 717 (1969). However, petitioner fails to cite this court to any Supreme Court law supporting a claim that the conditions of his bail constitute "punishment" for purposes of a double-jeopardy violation, and none is found. Instead, the purpose of bail, and any conditions placed on it, is to ensure a defendant's appearance at trial, and in some cases to protect the public or victim from the threat the defendant poses to them. *See Barton v. Van Buren,* No. 4:06-CV-799-Y, 2007 WL 1766775, at *2 (N.D.Tex. June 18, 2007. As such, the conditions of petitioner's bail were not punitive. Under his theory, such conditions would bar subsequent prosecution, conviction and imprisonment for the underlying crime. Such a result is absurd. Considering the nature and severity of the charges against petitioner, the conditions of his pretrial bail, including payment of a $60 supervisory fee and the costs of electronic monitoring and drug testing, were not punishment for purposes of

---

*v. Thomas,* No. 4:09-CV-206-Y, 2009 WL 3488062 (N.D.Tex. Oct. 27, 2009); *Green v. Anderson,* No. 4:09-CV-457-A (N.D.Tex. Jan. 21, 2010) (claiming payment of costs and fees deprived him of his property without due process). Petitioner did not raise his double-jeopardy claim presented now in those prior actions.

double jeopardy, but instead were rationally related to the

purpose of assuring that petitioner stayed away from his daughter

and appeared at future court proceedings.  The costs associated

with such monitoring are rationally related to the implementation

of those conditions and are sanctioned by state statute.[3]  *See*

TEX. CODE CRIM. PROC. ANN. arts. 17.44(e) & 102.012(a)-(b) (West

Supp. 2013); *Myers v. Quarterman,* No. A-08-CA-474-LY, 2009 WL

1620764, at *4 (W.D.Tex. June 8, 2009).  Petitioner is not

entitled to relief under his first ground.

## 2.  Ineffective Assistance of Counsel

Under his second ground, petitioner claims he received

ineffective assistance of trial counsel because counsel failed to

challenge for cause or strike a biased juror.  Pet'r Mem. 10-13,

ECF No. 2. A criminal defendant has a constitutional right to the

effective assistance of counsel at trial.  U.S. CONST. amend. VI,

XIV; *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  To

establish ineffective assistance of counsel a petitioner must

show (1) that counsel's performance fell below an objective

---

[3]The statutory provision authorizing the imposition of the costs of
electronic monitoring and drug testing as a condition of release on bond was
added effective September 1, 2009.  *See* Acts of May 5, 2009, 81st Leg., R.S.,
ch. 163, § 1, 2009 Tex. Gen Laws 499.  However, the undersigned finds no legal
support for a contention that it was unconstitutional for a state court to
assess such costs prior to the addition.

standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697.

Further, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. Where the state courts have applied the *Strickland* attorney-performance standard to factual findings, a federal court will defer to the state courts' determination unless it appears the decision was contrary to or involved an unreasonable application of *Strickland*, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence in the state court proceedings. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002); *Haynes v. Cain*, 298 F.3d 375, 379-82 (5th Cir. 2002).

Petitioner complains that Juror David Baulch was biased, based on his following answer to counsel's question regarding the presumption of innocence:

> *To my understanding, there are two forms, the American*
> *form, he is innocent until he's proven guilty.   I*
> *believe in one of the older English form, you're guilty*
> *until you're proven innocent, which is why we have the*
> *situation that we do.   And it must be reckoned like*
> *that. . . .*

RR, vol. 2, 95, ECF No. 17-1.

Counsel responded to petitioner's claim, *via* affidavit, as

follows:

> Juror David Baulch: Applicant's allegation left
> out a crucial part of Mr. Baulch's answer to my
> question.   While it's true Mr. Baulch indicated that he
> believed in one of the older English forms that said
> you're guilty until you're proven innocent.   He went on
> to say, "Many of the things you keep asking people
> about, I keep going, what if it were me? . . .   What if
> I were on trial?   What would I want?   I would want
> everything to the top level that I could possibly get."
> This response led me to believe that Mr. Baulch would
> be a strong juror in protecting the rights afforded an
> accused person including the right to be presumed
> innocent.   From this dialogue, I did not believe Mr.
> Baulch had a bias against the presumption of innocence
> or against Applicant.

SH41 - WR-78,871-02 at 222-23, ECF No. 18-3.

Based on counsel's affidavit, the state habeas court entered

the following findings of fact:

> 19.   Juror Baulch's answers indicated that he was
>        personalizing the rights afforded the accused and
>        wondering what he would want if it were he that
>        was on trial.

> 20.   Based on his observations of Juror Baulch and
>        experience, Hon. King concluded that Juror Baulch
>        would be a strong juror in protecting Applicant's

rights including the right to be presumed
innocent.

21. Hon. King's decision to not strike Juror Baulch
was the result of reasonable trial strategy.

22. Hon. King's decision to not challenge Juror Baulch
for cause was the result of reasonable trial
strategy.

*Id.* at 274, ECF No. 18-4 (citations to the record omitted).

Based on its findings, and applying the *Strickland* standard,
the state court concluded that petitioner had failed to prove the
juror was biased or prejudiced and that counsel's decision not to
strike or challenge Juror Baulch for cause was therefore the
result of reasonable trial strategy. *Id.* at 283.

A juror is biased if his views would prevent or
substantially impair the performance of his duties. *Soria v.
Johnson,* 207 F.3d 232, 242 (5th Cir. 2000). If a juror is not
biased, counsel's failure to challenge that juror does not
support a claim for ineffective assistance of counsel. *Virgil v.
Dretke,* 446 F.3d 598, 608-09 (5th Cir. 2006). Having considered
the juror's response, *in toto,* and absent clear and convincing
evidence in rebuttal, this court defers to the state court's
factual findings on the issue. 28 U.S.C. § 2254(e)(1). Applying
the appropriate deference, petitioner's claim is neither an
unreasonable application of *Strickland* nor unreasonable in light

11

of the evidence presented in state court.  Generally, decisions made by counsel during voir dire are considered to be matters of trial strategy.  *Teague v. Scott,* 60 F.3d 1167, 1172 (5th Cir. 1995).  Counsel's affidavit, which the state habeas court credited, shows that his decision was based on the belief that the juror held no bias against the presumption of innocence or against petitioner.  Courts recognize that trial counsel's experience and intuition are critical, drawing on insights available only through physical presence.  *Romero v. Lynaugh,* 884 F.2d 871, 877 (5th Cir. 1989).  Based on this record, there is no basis to find that the juror was actually or impliedly biased, that counsel's decision fell below an objective standard of reasonable performance, or that a reasonable probability exists that had counsel challenged for cause or struck the juror the result of his trial would have been different.  *Strickland,* 466 U.S. at 694.  Petitioner is not entitled to relief under his second ground.

## 3.  Confrontation Clause

Under his third ground, petitioner claims his right to confront witnesses against him was violated by the trial court's unfair restriction of his cross-examination of the victim regarding her past sexual behavior to establish bias or motive.

Pet'r's Mem. 13-15, ECF No. 2.   The state appellate court

addressed the issue as follows:

>        Green argues that the trial court violated his
> confrontation rights under the Sixth Amendment to the
> United States Constitution by excluding evidence of
> H.G.'s past sexual behavior.   Green argues that the
> evidence was admissible under Texas Rule of Evidence
> 412 (the "rape shield law") to show that H.G. had a
> bias against him and a motive to falsely accuse him of
> sexual assault.   The State contends that the evidence
> was not admissible under rule 412 and that,
> alternatively, any error in excluding the evidence was
> harmless.

>        We review a trial court's decision to admit or to
> exclude evidence under an abuse of discretion standard.
> *Weatherred v. State,* 15 S.W.3d 540, 542 (Tex. Crim.
> App. 2000); *see also Lagrone v. State,* 942 S.W.2d 602,
> 613 (Tex. Crim. App.) (explaining that a trial court
> "maintains broad discretion to impose reasonable limits
> on cross-examination to avoid, inter alia, harassment,
> prejudice, confusion of the issues, endangering the
> witness, and the injection of cumulative or collateral
> evidence"), *cert. denied,* 522 U.S. 917 (1997).   A trial
> court does not abuse its discretion as long as the
> decision to admit or to exclude the evidence is within
> the zone of reasonable disagreement.   *Montgomery v.
> State,* 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (op.
> on reh'g).

>        The Confrontation Clause of the Sixth Amendment to
> the United States Constitution provides that, "[i]n all
> criminal prosecutions, the accused shall enjoy the
> right . . . to be confronted with the witnesses against
> him."   U.S. Const. amend. VI; *Davis v. Alaska,* 415 U.S.
> 308, 316 (1974).   The Sixth Amendment right of
> confrontation is a fundamental right and is applicable
> to the states by virtue of the Fourteenth Amendment.
> *Pointer v. State,* 380 U.S. 400, 403 (1965); *Shelby v.
> State,* 819 S.W.2d 544, 546 (Tex. Crim. App. 1991).   The
> right to confront and to cross-examine is not absolute

and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. *Allen v. State,* 700 S.W.2d 924, 929, 931 (Tex. Crim. App. 1985) (holding that precursor to rule 412 was constitutional and did not, on its face, violate accused's right to confrontation); *see also Chambers v. Mississippi,* 410 U.S. 284, 295 (1973). Moreover, the Constitution requires only the introduction of otherwise relevant and admissible evidence. *See United States v. Nixon,* 418 U.S. 683, 711 (1974).

Texas Rule of Evidence 412, known as the rape shield law, governs the admissibility of a complainant's prior sexual relationships with third parties in a sexual assault case. *See* Tex. R. Evid. 412. Rule 412(b) provides that specific instances of a victim's past sexual conduct are inadmissible unless (1) the evidence falls within one of five categories of evidence listed in rule 412(b)(2), and (2) the trial court finds that the probative value outweighs the danger of unfair prejudice. *See* Tex. R. Evid. 412(b). Even if the evidence falls within the enumerated categories of rule 412(b)(2), the court must further find that the probative value of the evidence outweighs the danger of unfair prejudice. *See Holloway v. State,* 751 S.W.2d 866, 869-70 (Tex. Crim. App. 1988); *Stephens v. State,* 978 S.W.2d 728, 732 (Tex. App.–Austin 1998, pet. ref'd).

Rule 412 attempts to limit abusive, embarrassing, and irrelevant inquiries into a complainant's private life and to encourage victims of sexual assault to report those crimes. *See Allen,* 700 S.W.2d at 929; *Wofford v. State,* 903 S.W.2d 796, 798 (Tex. App.–Dallas 1995, pet. ref'd). The court of criminal appeals has expressed the rationale of provisions such as rule 412 by stating that

> evidence of a rape victim's prior sexual activity is of dubious probative value and relevance and is highly embarrassing and prejudicial. Often such evidence has been used to harass the prosecuting victim.

> Sponsors of these statutes assert that they
> encourage victims of sexual assault to report
> the crimes without fear of having their past
> sexual history exposed to the public.

*Allen*, 700 S.W.2d at 929 (quoting *Bell v. Harrison*, 670
F.2d 656, 658 (6th Cir. 1982)).

At trial, defense counsel attempted to offer
evidence that H.G. made the sexual assault allegations
against Green in retaliation for his bringing sexual
assault charges against Donald Fincher, the father of
her baby.  The trial court permitted defense counsel to
make an offer of proof in a rule 412 hearing.

During the hearing, H.G. testified that when she
was fifteen, she and Fincher, who was twenty-eight or
twenty-nine at the time, had a sexual, "voluntary
relationship" for a few weeks. They had sex more than
one time on a single occasion, and H.G. got pregnant.-
In March 2007, H.G. told Green that she was pregnant
with Fincher's child, and Green forced her to go to the
police department to file charges against Fincher.
H.G. testified that she did not want to file charges,
but she denied ever threatening Green that she would
put him in jail if she found out that he had anything
to do with Fincher's prosecution.  H.G. ultimately went
to the police station with Green, wrote a statement
explaining what had happened between her and Fincher,
and submitted to a DNA test.  In November 2007, Green
and H.G. learned that Fincher had accepted a ten-year
sentence for what he had done to H.G.  That same month,
H.G. told her uncle about her sexual relationship with
her father.

Green also testified that H.G. had not wanted to
file charges against Fincher but that Green had told
H.G. that her baby could be taken away if she "did not
do what was right."  According to Green, in March 2007,
when H.G. told him that she was pregnant, she
threatened Green that "if she found out that [he]
pressed charges [on Fincher], she would have [Green]
put in jail as well."  Green said that H.G. only made

that one threat.   Around Thanksgiving 2007,
approximately five months after the baby was born and
nine months after H.G. had allegedly threatened Green,
Green and H.G. learned of Fincher's plea bargain.
Green testified that he "didn't notice a reaction" in
H.G. when they heard the news.

H.G.'s uncle testified that H.G. had denied that
Fincher was her boyfriend and had instead told her
uncle that she wanted to prosecute Fincher because he
had raped her.

At the end of the rule 412 hearing, defense
counsel argued that the evidence was admissible "to
show bias or prejudice on the part of the victim in
this case, that she made at least one threat that she
would see [Green] put in jail over the Donald Fincher
allegations and prosecution, and therefore, this is the
linchpin to our defense."   The trial court ultimately
sustained the State's objection to the introduction of
any evidence that H.G. had sexual relations and a baby
with Fincher.   The court stated, "If you want to put
your client on in front of [the] jury, I'll let you do
it, and I'll let you ask him . . . if [H.G.] ever
threatened him.   But you won't go into the underlying-
any underlying sex on the part of this witness.   That's
a violation of the statute, the Texas law."

We will assume that the trial court abused its
discretion by prohibiting Green from introducing the
proffered testimony to support his defensive theory and
that the proffered evidence formed such a vital portion
of Green's case that its exclusion effectively
precluded him from presenting a defense; consequently,
we will conduct a harmless error analysis under rule
44.2(a).   *See* Tex. R. App. P. 44.2(a); *Rubio v. State,*
241 S.W.3d 1, 3 (Tex. Crim. App. 2007); *Potier v.
State,* 68 S.W.3d 657, 665 (Tex. Crim. App. 2002)
("[T]he exclusion of a defendant's evidence will be
constitutional error only if the evidence forms such a
vital portion of the case that exclusion effectively
precludes the defendant from presenting a defense.").

16

Under rule 44.2(a), we must reverse unless we
determine beyond a reasonable doubt that the error did
not contribute to Green's conviction or punishment.
Tex. R. App. P. 44.2(a). The question is whether the
trial court's failure to allow Green to introduce
evidence of H.G.'s past sexual behavior to show her
bias or motive to lie was harmless beyond a reasonable
doubt. *See Williams v. State,* 958 S.W.2d 186, 194
(Tex. Crim. App. 1997). In applying the "harmless
error" test, our primary question is whether there is a
"reasonable possibility" that the error might have
contributed to the conviction. *Mosley v. State,* 983
S.W.2d 249, 259 (Tex. Crim. App. 1998), *cert. denied,*
526 U.S. 1070 (1999).

Our harmless error analysis should not focus on
the propriety of the outcome of the trial; instead, we
should calculate as much as possible the probable
impact on the jury in light of the existence of other
evidence. *Wesbrook v. State,* 29 S.W.3d 103, 119 (Tex.
Crim. App. 2000), *cert. denied,* 532 U.S. 944 (2001).
We consider the source and nature of the error, the
extent that it was emphasized by the State, its
probable collateral implications, the weight a juror
would probably place on the error, and whether
declaring it harmless would be likely to encourage the
State to repeat it with impunity. *Harris v. State,* 790
S.W.2d 568, 587 (Tex. Crim. App. 1989). This requires
us to evaluate the entire record in a neutral,
impartial, and even-handed manner, not "'in the light
most favorable to the prosecution.'" *Id.* at 586
(quoting *Jackson v. Virginia,* 443 U.S. 307, 319
(1979)).

After a careful and neutral review of the record,
we conclude beyond a reasonable doubt that the
exclusion of this testimony did not contribute to
Green's conviction or punishment. *See* Tex. R. App. P.
44.2(a). This is not just a case of "he said, she
said." *Cf. Billodeau v. State,* 277 S.W.3d 34, 42 (Tex.
Crim. App. 2009) ("In many sexual-assault cases, the
only evidence linking the accused to the offense is the
complainant's accusations."); *Wheeler v. State,* 67

S.W.3d 879, 888 (Tex. Crim. App. 2002) (recognizing
that in prosecutions for sexual offenses, a successful
conviction "'often depend[s] primarily on whether the
jury believe[s] the complainant, turning the trial into
a swearing match between the complainant and
defendant'" (citation omitted)); *Kelly v. State,* 321
S.W.3d 583, 594 (Tex. App.–Houston [14th Dist.] 2010,
no pet.) (noting, in holding that exclusion of evidence
was harmful under rule 44.2(a), that "the believability
of the children's testimony is at the heart of this
case"). Rather, the State presented scientific
evidence showing that H.G.'s epithelial cells and
Green's sperm cells were found on two towels next to
the bed that they shared and on a sheet taken from
their bed. Green's ex-wife and H.G.'s brother both
testified to suspicious behavior between Green and
H.G., including that they shared a bedroom and spooned
on the couch together with H.G.'s face in Green's
crotch. Thus, while H.G.'s testimony that her father
had sexually abused her was no doubt important to the
State's case, the State also relied on other testimony
and scientific evidence to establish that Green had
sexually assaulted H.G. *Cf. Stephenson v. State,* 226
S.W.3d 622, 628 (Tex. App.–Amarillo 2007, no pet.)
(holding that when State presented no evidence tying
defendant to crime other than complainant's
identification of defendant as perpetrator, wrongful
exclusion of defense expert testimony pertaining to
reliability of eyewitness identification of suspect was
harmful); *Fox v. State,* 115 S.W.3d 550, 564 (Tex.
App.–Houston [14th Dist.] 2002, pet. ref'd) (holding as
harmful under rule 44.2(b) the exclusion of evidence
that supported defense's theory under doctrine of
chances when State's case boiled down to complainant's
allegation of sexual abuse, inconclusive physical
evidence, and weak circumstantial evidence); *see also
Reed v. State,* No. 02-02-0055-CR, 2003 WL 1894581, at
*7 (Tex. App.–Fort Worth Apr.17, 2003, pet. ref'd) (op.
on reh'g) (not designated for publication) ("The story
told by the physical evidence in this case is simply so
strong that we cannot conclude the jury would have been
influenced by . . . testimony concerning the statement
Samantha made in the emergency room.").

18

Moreover, Green testified at the rule 412 hearing that H.G. had threatened to "put him in jail" if he reported Fincher to the police. While Green's testimony shows that H.G. had threatened to tell the police about their relationship, it does not establish that she threatened to *falsely* accuse him of sexual assault. And the evidence shows that she made this threat a single time, months before she actually made her outcry, and that at no point during the police investigation in Fincher's prosecution did she ever tell the police about her relationship with Green.

We recognize that the jury is the ultimate factfinder on such issues as the credibility of the witnesses and the weight to be given to their testimony. *See Billodeau,* 277 S.W.3d at 43. But in light of the strong scientific and circumstantial evidence of Green's guilt and the tenuous implication that a single threat to put Green in jail—made months before H.G. made her outcry—was a threat to falsely accuse him, we cannot conclude that the jury would have been influenced by the excluded testimony. *See Wesbrook,* 29 S.W.3d at 119. After carefully reviewing the record and performing the required harm analysis under rule 44.2(a), we hold beyond a reasonable doubt that the trial courts alleged error did not contribute to Green's conviction or punishment. *See* Tex. R. App. P. 44.2(a).

SH41 WR-78,871-02, Mem. Op. 358-66; ECF No. 18-4 (paragraph headings omitted).

Although no Supreme Court case is found addressing the validity of Texas's rape shield law, trial courts may constitutionally impose reasonable restrictions on a defendant's ability to confront adverse witnesses and present allegedly relevant evidence in his own defense when they serve legitimate state interests in the criminal trial process. *Michigan v.*

19

*Lucas,* 500 U.S. 145, 150-53 (1991); *Chambers v. Mississippi,* 410 U.S. 284, 295 (1973).   Thus, even if relevant, exclusion of the evidence of a victim's previous sexual experiences represents such a legitimate interest.   *See, e.g., Stephens v. Miller,* 13 F.3d 998, 1004 (7th Cir. 1994).   Rape-shield statutes represent a valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy.   *See Lucas,* 500 U.S. at 150. Moreover, assuming exclusion of the testimony violated petitioner's right to cross-examine H.G. to establish bias or motive, the error is subject to harmless-error analysis. *Delaware v. Van Arsdall,* 475 U.S. 673, 684 (1986).   In these circumstances, the Supreme Court has stated:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts.   These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Olden v. Kentucky,* 488 U.S. 227, 232-33 (1988).   While many

sexual assault cases involve the prototypical "swearing match" between the complainant and defendant, in which witness credibility is decisive, this case does not fit within that same mold.   Although K.G.'s testimony was undoubtedly important to the state's case, the corroborating DNA and testimonial evidence was strong and diminished any probative value of the excluded evidence.   Therefore, exclusion of the evidence did not have a substantial and injurious effect on the jury's verdict.   *See Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993).   Petitioner is not entitled to relief under his third ground.

For the reasons discussed herein,

The court ORDERS the petition of petitioner for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby, denied.   The court further ORDERS that a certificate of appealability be, and is hereby, denied.

SIGNED November 2 4, 2014.

JOHN MCBRYDE
UNITED STATES DISTRICT JUDGE

21